# EXHIBIT A

**OPHRYS, LLC**
**BK FORWARD FLOW**
**PURCHASE AND SALE AGREEMENT**

**Forward Flow 2013 OneMain Chapter 13 Accounts**

This Purchase and Sale Agreement (the "Agreement") is made as of April 12, 2013, between the undersigned entities (collectively, the "Seller") and Ophrys, LLC, ("Buyer"), organized under the laws of Washington, with its headquarters/principal place of business at 2001 Western Avenue, Suite 430, Seattle, WA 98121.

WHEREAS, the Seller desires to sell and Buyer desires to purchase on a monthly flow basis certain Seller's consumer loan accounts on the terms and conditions hereinafter provided;

NOW, THEREFORE, in consideration of the mutual promises herein, Buyer and Seller agree as follows:

1.   **DEFINITIONS**

1.1     "Account Document" means, with respect to any Account, any application, billing statement, notice, correspondence or other information in the Seller's possession that relates to an Account. An Account Document may include, without limitation, original documents or copies thereof, whether by photocopy, microfiche, microfilm or other reproduction process.. Excluded from the definition of Account Document are terms and conditions, correspondence, reports, information, internal analyses, sensitive attorney-client privileged documents, internal memoranda, credit information, regulatory reports, and/or internal assessments of valuation of such Account, or any other documents relating to an Account that may be, but are not necessarily, missing or excluded (whether intentionally or unintentionally).

1.2     "Accounts" means the Seller's Chapter 13 accounts and receivables to be summarized monthly on an Asset Schedule (the form of which is attached hereto as Exhibit 1) and the final electronic file describing each, as to which the applicable Obligors have filed a Chapter 13 Proceeding, and which were serviced by the Seller prior to the date of this Agreement, the balances of which the Seller has written off for accounting purposes, subject to any pre-closing adjustment pursuant to Section 2.2.

1.3     "Asset Schedule" means the schedule summarizing the Accounts identified in the applicable data file delivered by the Seller to the Buyer pursuant to Section 2.4. A form of the Asset Schedule is attached hereto as Exhibit 1.

1.4     "Chapter 13 Proceeding" means a proceeding under Chapter 13 of the Bankruptcy Code, pursuant to which an individual may file a Chapter 13 plan for payment of some or all of his or her debts.

1.5     "Closing Date" means the monthly agreed upon date on or after the seventh business day of such month and continuing thereafter until the Agreement is terminated pursuant to Article 12.13, or such other date mutually agreed to by Buyer and the Seller.

Contract ID: OP3NU1BM041213

1.6      "Cut-Off Date" means the monthy date specified for the individual lots as referenced in the Asset Schedule (Exhibit 1).

1.7      "Obligor" means the person in whose name an Account was established.

1.8      "Purchase Price" means an amount equal to the product of the Purchase Price Percentage (referred to as Sales Rate on Exhibit 1) multiplied by the aggregate Sale Amount (as provided in Exhibit 1), summarized in the monthly Asset Schedule as of each Cut-Off Date, subject to Pre-Closing Adjustment pursuant to Section 2.2.   The Purchase Price shall be paid monthly in accordance with Section 2.3 of this Agreement.

1.10     "Purchase Price Percentage" means 18.60%.

## 2.      PURCHASE AND SALE OF ACCOUNTS

2.1      Purchase and Sale.  On the basis of, and subject to, the representations, warranties and covenants in this Agreement, the Seller agrees to sell, assign and transfer to Buyer, and Buyer agrees to purchase from the Seller on the applicable Closing Date all right, title and interest of Seller in and to the Accounts.   Buyer has made an independent investigation as it deems necessary as to the nature, validity, collectibility, enforceability and value of the Accounts, and as to all other facts that Buyer deems material to Buyer's purchase.   Buyer enters into this Agreement solely on the basis of that investigation and Buyer's own judgment. Buyer has made an independent determination that the Purchase Price represents the Accounts' fair and reasonable value.  The sale and assignment are without recourse to the Seller, except as expressly stated in Articles 3 and 10, and without warranty of any kind (including, without limitation, warranties pertaining to validity, collectibility, accuracy or sufficiency of information), except as stated in Article 3 below. Buyer acknowledges and understands that Seller has not provided the date of first delinquency of the Accounts for FCRA reporting purposes, and that it is Buyer's responsibility to obtain that information from credit reporting agencies or other sources. Buyer also understands that the Account balances purchased include finance charges assessed up to the date the Obligor(s) commenced their Chapter 13 Proceeding.  Buyer is not acting in reliance on any representation by the Seller, except as set forth in Article 3 below. Seller makes no commitment as to the particular volume of Accounts to be delivered.

2.2      Pre-Closing Adjustment.   The Purchase Price amount stated in Section 1.8 shall be adjusted to reflect any changes in the status of the Accounts as of the applicable Cut-Off Date, as follows:

         (a)      a change in the balance of any Account from the balance shown on the due diligence tape provided to Buyer; and

         (b)      retention by the Seller of any Account that on the Cut-Off Date (i) to the Seller's knowledge, fails to meet the representations set forth in Section 3; or (ii) the Seller determines that there is a pending or threatened suit, arbitration, or other legal proceeding,  other than a Chapter 13 Proceeding, or investigation relating to an Account or a Obligor, and naming the

Contract ID: OP3NU1BM041213

Seller or otherwise involving the Seller's interest therein in a manner unacceptable to the Seller, or the Seller otherwise determines (in its sole discretion) that such matter cannot be resolved and/or that the Seller's interest therein cannot be adequately protected without the Seller owning such Account.

The Purchase Price will be adjusted by the adjustment amount associated with any balance or Account described above.  The Seller will notify the Buyer of the adjusted Purchase Price prior to the applicable Closing Date.

2.3     Payment.  On each monthly Closing Date, Buyer shall pay to the Seller the balance of the Purchase Price which shall be due and payable by or before 4:00 p.m. Eastern Standard Time on the applicable Closing Date.  The Seller will transfer the Accounts to Buyer in accordance with Section 2.4 below. Buyer shall transmit the payments to the Seller by wire transfer in accordance with the instructions provided to Buyer by Seller.

2.4     Transfer.   On each applicable Closing Date, subject to satisfaction or waiver of the conditions precedent set forth in Article 5 of this Agreement, the Seller will execute and deliver to the Buyer a Bill of Sale and Assignment substantially in the form of Exhibit 2 and other mutually agreed upon closing documents, including an Affidavit of Sale substantially in the form of Exhibit 4.  The Seller will provide to Buyer, at least one day prior to each applicable Closing Date or at such other time as is mutually agreed to by the Buyer and Seller, a data file listing the Accounts as of the applicable Cut-Off Date that are to be purchased by the Buyer for such Closing Date. On the applicable Closing Date, Seller will transfer all Seller's right, title and interest in and to the Accounts and Buyer will assume, with respect to each Account, all of Seller's rights, responsibilities, and obligations that arise as a result of Buyer's purchase of the Accounts.  If the Seller receives any payments of principal and/or interest by or on behalf of any Obligor with respect to an Account between the Cut-off Date and the Closing Date, Seller shall hold such amounts in trust for Buyer and pay over such amounts to Buyer (without interest thereon) within sixty (60) days after the applicable Closing Date.  If payments are received by the Seller from an Obligor on or after Closing Date, the Seller shall forward such payments (without interest thereon) to Buyer within sixty (60) days from date of receipt. Seller shall charge Buyer a fee of $5.00 per forwarded payment to process any Account payment received by Seller more than one (1) year after the applicable Closing Date. Seller may, at its discretion, deduct such processing fee when remitting the payments to Buyer.

2.5     Bill of Sale and Assignment.  The Bill of Sale and Assignment for each applicable Closing Date shall be sent on the date of Seller's receipt of the Purchase Price for delivery to Buyer by express courier, next day delivery, or email.  In the event Seller does not receive the Purchase Price as provided herein, Buyer shall within one business day of receipt of demand return any computer printout or data file listing of the Accounts, remove any records of the Accounts from its system, and return the original or any copy of the Bill of Sale and Assignment and any other closing documents to Seller.  In such event the transaction may be terminated as stated in the notice subject to any rights or remedies a party may have for non-performance by the other party.

Contract ID: OP3NU1BM041213

2.6     Sales, Use or Transfer Taxes.  If any sales, use or transfer tax is assessed or otherwise payable as a result of the transactions contemplated hereby, Buyer shall assume the obligation to pay such tax.  Neither Buyer nor Seller is aware of any such taxes that will become due as a result of this transaction.

## 3.     REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller makes the following representations and warranties as of the date of this Agreement, and as of each Closing Date:

3.1     Due Organization; Authorization.  The Seller is duly organized, existing and in good standing, and each Seller's execution, delivery, and performance of this Agreement are within such Seller's corporate powers and have been duly authorized by all necessary corporate action.

3.2     Servicing.  After each applicable Cut-Off Date, the Seller shall not compromise, settle (for less than full value) or otherwise release an Obligor on any Account without Buyer's consent.   After the Cut-Off Date, the Seller will undertake only those servicing activities necessary to preserve and maintain the integrity and enforceability of the Accounts.

3.3.1     Representations Concerning Accounts. With respect to each Account, the Seller represents that to the best of its knowledge as of each applicable Cut-Off Date:

>    (a)  the Obligor is involved in an active Chapter 13 Proceeding which has not been dismissed, converted, discharged, completed or closed.

>    (b)  the Account was assigned to Buyer at least 20 days prior to the applicable bar date.

>    (c)  the debt represented by such Account has not been satisfied and/or the stated balance on such Account has not been paid.

>    (d)  no final judgment has been entered by a court of competent jurisdiction with respect to the debt represented by the Account.

>    (e)  the Obligor has not been released from liability on the Account.

>    (f)   there is no dispute, claim, action, suit or proceeding pending or threatened with respect to any Account;

>    (g)  the current balance on the Obligor is $100 or more;

>    (h)  the Obligor is not deceased;

>    (i)  each Account is a legal, valid and binding obligation of the Obligor, provided that, Seller makes no representation or warranty as to any Account being within the statute of limitations applicable to the Account;

(j) information provided by Seller on on the due diligence file is substantially similar to the final electronic file provided to Buyer in connection with the closing and specified on Exhibit 1;

(k) information provided by Seller on the final electronic file provided to Buyer in connection with the closing and specified on Exhibit 1 is materially true and correct; and

(l) no Account has been issued a 1099 C.

3.3.2   Additional Representations and Warranties of Seller.  Seller represents that to the best of its knowledge as of the applicable Closing Date:

(a)  the Seller has good and marketable title to the Account, is the sole owner thereof and has full right to transfer and sell the Account and each Account is free and clear of any encumbrance, equity, lien, pledge, charge, claim, security interest, obligation to third party collection agencies or attorneys previously retained by the Seller;

(b) each Account is closed and there is no requirement for future advances of credit or other performance by Seller; and

(c) each Account has been originated, maintained and serviced in compliance with applicable state and federal laws including where applicable, without limitation, the Truth in Lending Act, the Equal Credit Opportunity Act, the Fair Debt Collection Practices Act, the Fair Credit Reporting Act, and the Fair Credit Billing Act;

The Seller makes no other representations or warranties, express or implied, with respect to any of the Accounts other than as specifically set forth in this Section 3.3.

3.4   Remedies for Breach of Representations Concerning Accounts

(a) Time Period. Buyer's sole remedy against Seller, other than indemnification per Article 10.2, for a breach of any of the representations listed in Article 3 shall be to notify the Seller of the breach ("Notice of Claim") no later than 180 days from the applicable Closing Date.  Seller shall then have, at its option, the obligation to either (A) cure such breach referred to in the Notice of Claim, in all material respects or (B) repurchase the affected Accounts by paying Buyer the Purchase Price Percentage multiplied by the unpaid balance of the Account, adjusted for any payments received after the applicable Closing Date ("Repurchase Price").  A Notice of Claim under this Section 3.4 must be delivered by the Buyer to the Seller in writing or in electronic format and accompanied by the documentation required under Section 3.4(b).  The Buyer's failure to provide a Notice of Claim with respect to any claimed breach of Seller as provided in this Section 3.4 shall terminate and waive any rights Buyer may have to any remedy for breach under Article 3 of this Agreement with respect to such Account, provided however that this limitation of remedies shall not limit Seller's indemnification obligations to Buyer under Section

Contract ID: OP3NU1BM041213

10.2. Seller may not use the "best of knowledge" qualification contained in Section 3.3 as a defense to a claim made by Buyer under this Section 3.4. Notwithstanding the foregoing, a claim of a breach of representation under Sections 3.3.2 (a) and (c) shall not be subject to the 180 day limitation.

(b)  Form of Notice Required.  Buyer shall notify Seller in writing of each Account of which Buyer seeks to have Seller repurchase. All notices shall contain the Obligor's name and Seller's account number and will be accompanied with the following information as applicable: Buyer name, buyer account number, status reason code, Obligor name, purchase balance, amount paid, debtor social security number, closed date, sale date, product, purchase rate, status detail, portfolio ID and the following applicable documentary evidence:

| | |
|---|---|
| Bankruptcies: | Credit Bureau with non-dismissed bankruptcies, or |
| | Attorney name, case number, and date of filing, or |
| | Copy of actual court papers, or approved third party service |
| | (Banko, Inc.; Experian; Trans Union; or Equifax) |
| | |
| Deceased: | Copy of death certificate, or |
| | Credit bureau indicating date of death, or |
| | Executor or attorney letter with date of death, or |
| | approved third party service (Banko, Inc.; Experian; Trans |
| | Union; or Equifax) |
| | |
| Settled or Paid in Full: | Copy of Seller or Seller's agent letter verifying action; or |
| | Copy of the canceled, final check (front and back) |
| | |
| Fraud: | Letter from or to Seller or Seller's agent; or |
| | Complaint in writing explaining event |

Seller shall make a determination within forty five (45) business days after receipt of Buyer's Request, unless Seller's delay in responding is caused by or related to Buyer's failure to provide Seller with necessary information and documentation required under this Section 3.4. If the Seller determines that Buyer has submitted an Account for repurchase without the necessary information and documentation, the Seller shall notify the Buyer of such defect and the Buyer shall have seven calendar days to resubmit the Account with the appropriate information and documentation.

(c)  Repurchase Terms.  If the Seller is required to repurchase the Accounts, the Seller shall not be obligated to make payment on an Account by Account basis, but may elect to provide such adjustment in a single payment within 30 days of notification, at Seller's option. If Seller repurchases any Account under this Agreement, all right, title and interest in the repurchased Account shall automatically re-vest to Seller and Seller shall be entitled to receive all payments made to the Account after the repurchase date.

Contract ID: OP3NU1BM041213

3.5    No Adverse Selection.  The Seller reserves the right to withhold up to 10% of the like eligible Accounts for internal control purposes.  Subject to the foregoing, the Seller will not employ any selection criteria, materially adverse to the interest of Buyer, in selecting the Accounts sold to the Buyer hereunder.

## 4.    REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer makes the following representations and warranties as of the date of each Closing Date:

4.1    Due Organization; Authorization.  Buyer is duly organized, existing and in good standing as a limited liability company under the laws of the State of Washington.   Buyer has full authority to execute, deliver and perform this Agreement according to its terms.  The execution and delivery of this Agreement by Buyer and the performance of its obligations hereunder will not (i) conflict with or violate (A) the organizational documents of Buyer, or (B) any provision of any law or regulation to which Buyer is subject, or (ii) conflict with or result in a breach of or constitute a default (or any event which, with notice or lapse of time, or both, would constitute a default) under any of the terms, conditions or provisions of any agreement or instrument to which Buyer is a party or by which it is bound or any order or decree applicable to Buyer or result in the creation or imposition of any lien on any of its assets or property. Buyer has obtained all consents, approvals, authorizations or orders of any court or governmental agency or body, if any, required for the execution, delivery and performance by Buyer of this Agreement.

4.2    No Conflict.  Buyer's review of Account and Obligor information will not represent a conflict of interest on the part of Buyer or Buyer's officers or employees, and that neither Buyer nor any of Buyer's affiliated companies is presently a party to any litigation, or involved in any litigation, with the Seller.

4.3    Investigation of Accounts.  Buyer is a sophisticated investor and its bid and decision to purchase the Accounts are based upon its own independent expert evaluations of the nature, validity, collectibility, enforceability and value of the Accounts.  The Buyer has had sufficient opportunity to complete the independent investigation and examination into the Accounts that Buyer deems necessary. Buyer enters into this Agreement solely on the basis of that investigation and Buyer's own judgment.  Buyer has made an independent determination that the Purchase Price represents the Accounts' fair and reasonable value.   Buyer is not acting in reliance on any representation by the Seller, except those listed in Section 3.3.

4.4    Accounts Sold "As Is".  Buyer acknowledges and agrees that except for warranties and representations set forth in Section 3.3 of this Agreement, Seller has not and does not represent, warrant or covenant the nature, accuracy, completeness, validity, or enforceability of any of the Accounts and supporting documentation provided by Seller to Buyer, and, subject to the terms of this Agreement, all documentation, information, analysis and/or correspondence, if any, which is or may be sold, transferred, assigned and conveyed to Buyer with respect to any and all Accounts is are sold, transferred, assigned and conveyed to Buyer on an "AS IS, WHERE IS" basis, WITH ALL FAULTS.

4.5     No Finders.  Buyer has not utilized any investment banker or finder in connection with the transaction contemplated hereby who might be entitled to a fee or commission upon consummation of the transactions contemplated in this Agreement.

4.6     Buyer Profile Information.   Buyer acknowledges and agrees that the information provided in the buyer profile information is true and accurate.

## 5.     CONDITIONS PRECEDENT TO PURCHASE AND SALE OF ACCOUNTS

5.1     Representations and Warranties.  The representations and warranties of the Seller and Buyer in this Agreement will be true and correct as of each Closing Date.

5.2     Compliance with Covenants and Agreements.  Buyer and the Seller will have complied in all material respects with each of their respective covenants and agreements in this Agreement on or before each Closing Date.

5.3     No Violation of Law.  Consummation by Buyer and the Seller of the transactions contemplated by this Agreement and continued performance of this Agreement will not violate any order of any court or governmental body having competent jurisdiction or any law or regulation that applies to Buyer or the Seller.

5.4     Approvals and Notices.   All required approvals, consents and other actions by, and notices to and filings with, any governmental authority or any other person or entity will have been obtained or made.  If Buyer is a corporation, and Seller requests the same, Buyer will have delivered to the Seller a certificate from Buyer's corporate secretary (or other documentation satisfactory to the Seller and its counsel) certifying that Buyer's board of directors has resolved or consented to Buyer entering into this Agreement and consummating the transactions contemplated hereby.

## 6.     RIGHTS AND OBLIGATIONS OF THE SELLER AND BUYER AFTER EACH CLOSING DATE

6.1     Notice to Obligors.  Buyer shall NOT provide any notice directly to any Obligor of the transfer of an Account unless required by the Bankruptcy Code or other applicable law.  Buyer shall, as part of filing a proof or transfer of claim with the Bankruptcy Court, identify itself as the transferee.  Notwithstanding the foregoing, in the event that Buyer determines an Account is legally collectible, Buyer may commence collection efforts.

6.2     (a)     Account Document Retrieval:  After each Closing Date, the Seller will furnish Buyer Account Documents that Buyer reasonably requests. For the purpose of this paragraph, except as provided below, each item provided by Seller shall be considered a separate Account Document.  This subsection shall not apply to affidavits, terms and conditions, and other special requests ("Other Documents"), which are outlined in section 6.2 (c).  If Seller receives Buyer's requests within 180 days of the applicable Closing Date(s), Seller will furnish at no charge to Buyer a maximum number of three Account Documents per Account on up to 10% of the total Accounts purchased for each Sale ID referenced on Exhibit 1.  The Buyer will be charged $10.00

for each Account Document furnished (i) on Accounts in excess of the 10% threshold, or greater than three Account Documents within the 10% threshold, or requested more than 180 days after the applicable Closing Date, but prior to three years after the applicable Closing Date. For illustration purposes, if Buyer purchases 100 Accounts, Seller will furnish, at no charge, and at Buyer's request, three Account Documents, for ten accounts to Buyer within the first 180 days, If Buyer requests all statements on a particular Account within the first 180 days and the requested Account is within the 10% threshold, and all requested statements for the Account consist of 12 months, Seller shall charge Buyer $10.00 for each of the Account Documents in excess of three Account Documents. Except in instances of litigation unrelated to collection activity or Accounts that are within the statute of limitation when filed, the Seller will have no obligation to provide Buyer with Account Documents after three years after the applicable Closing Date. Buyer shall not use any court process or legal proceeding to obtain any Account Document or other information about the Accounts unless required to defend Buyer or its affiliates in an action instituted by a third party. The Seller will use reasonable diligence to provide the Account Document. The failure of the Seller to provide any Account Document requested by Buyer will not be a breach of this Agreement. The Seller is currently establishing an Account Document retrieval system through the Seller's authorized vendor, Convoke Systems (Convoke Systems). Once the Seller has implemented a process for the Buyer to obtain Account Documents through Convoke Systems, and the Seller has notified the Buyer that the Convoke System process is operating (the "Trigger Date"), Buyer shall submit its request for Account Documents through Convoke Systems via its website (http://www.convokesystems.com/), subject to the Seller's reasonable requirements. In addition, Buyer shall require its Downstream Buyers to submit requests for Account Documents through the Convoke Systems website, which requires evidence of the sale. To the extent available, Account Documents will be furnished to the Buyer (or Downstream Buyers) within sixty (60) days of the date of the request. Requests shall contain sufficient information about the relevant accounts to allow Seller to locate the Account information to complete the request and be provided in a standard form if provided by the Seller.

(b)  Ownership; Use. Account Documents provided to Buyer after the Trigger Date and through Convoke System shall remain the exclusive property of Seller and no transfer of ownership in and to the Account Documents shall occur by way of this Agreement. Buyer shall be granted a limited right to use the Account Documents solely for the purpose of lawful recovery on an Account, and for the purpose of defending any claim, suit, action or other third party proceeding instituted against Buyer or affiliated. Buyer shall at all other times treat as confidential, and shall not at any time disclose, copy, duplicate, record or otherwise reproduce, in whole or in part, or otherwise make available to any unauthorized person or source (including any Downstream Buyer, as that term is defined in Section 9.1), the Account Documents or any related information. Upon transfer or assignment of any Account by Buyer, Buyer shall destroy, and shall cause others under its control to destroy, all acquired Account Documents within its possession, custody or control, whether in electronic form or otherwise, other than any copy which may be included in an archive or computer backup. Buyer shall not provide, and shall prohibit any third-party within its control from providing, any Account Document (whether or not for monetary consideration), whether in electronic form or otherwise, to any Downstream Buyer. All Account Documents will be made available to the Downstream Buyer after (1) all purchase and transfer contracts are completed, (2) the Downstream Buyer has registered with Seller's authorized vendor, Convoke Systems via its website (http://www.convokesystems.com/),

and (3) Buyer has identified, on Convoke Systems website, those accounts sold to the Downstream Buyer.

(c)   Other Documents.   Buyer may, in addition to its request for Account Documents, request Other Documents, such as an affidavit, in the Seller's standard form, or terms and conditions. The Seller shall have no obligation to provide a total number of affidavits in excess of five percent (5%) of the total Accounts purchased for each Sale Id referenced on Exhibit 1. For each lot purchased, the Buyer shall be limited to one request for affidavits per week with a maximum of 100 Accounts per request. Seller shall have sixty (60) days to provide the Other Documents requested, except for affidavits for which there will be thirty (30) days to complete the request. Requests shall contain sufficient information about the relevant Accounts to allow Seller representatives to locate the Account information to complete the affidavits and be provided in a standard form if provided by Seller.  The Buyer shall pay Seller $10.00 per each Other Documents requested and provided.  Payment shall be due at the time Other Documents is provided.  Failure of the Seller to provide any Other Documents requested by Buyer will not be a breach of this Agreement.  In addition, Seller will use its commercially reasonable efforts to provide Buyer, upon request, certain affidavits required by local, state and federal law to evidence the sale of the Accounts by Seller to Buyer. Seller and Buyer shall mutually agree to a delivery deadline for any affidavits requested and agreed to by Seller; provided, however, that Seller's good faith refusal to provide Buyer with any requested affidavit shall not be a breach of this Agreement.

(d)   Rush Requests.   Seller's production of Account Documents and or Other Documents in an accelerated timeframe at the Buyer's request ("Rush Requests") will be charged (i) the $10.00 fee for each document pursuant to Section 6.1(a) regardless of whether the Account Document is within the 10% threshold, plus (ii) an additional $10.00 per Account Document.

6.3   Credit Bureau Reporting.   The Seller may promptly request that the major credit reporting agencies (including, without limitation, Equifax, Experian and Trans Union) delete or mark the Accounts on their records sold or transferred to Buyer.  The Buyer may report its ownership of the Accounts to credit reporting agencies provided that the Buyer agrees to comply with the Fair Credit Reporting Act (FCRA) and any other laws or regulations governing credit agency reporting.

6.4   Compliance with Law.   With respect to any Account, Buyer or Buyer's agent will at all times: (a) comply with all applicable state and federal laws applicable to debt collection and the privacy of financial information, including, without limitation, the Consumer Credit Protection Act, the Fair Credit Reporting Act and the Fair Debt Collection Practices Act, and (b) for any Account where the statute of limitations has run, not falsely represent that a lawsuit will be filed if the Obligor does not pay.

6.5   Obligor Contacts.   Neither party shall make contact with any Obligor.  Any attempts to make any recovery in reference to an Account shall be made exclusively through the Bankruptcy Court or as otherwise allowed by the Bankruptcy Code or other applicable law. Notwithstanding the foregoing, in the event that Buyer determines an Account is legally collectible, Buyer may commence collection efforts.  If Buyer learns of an indicator, note or flag that demonstrates that

Contract ID: OP3NU1BM041213

the Obligor claims to be an identity theft victim, Buyer shall promptly notify Seller, and Seller shall repurchase the Account for the Repurchase Price.

6.6   <u>Notice of Claims</u>.  Buyer will notify the Seller, and Seller will notify Buyer, promptly of any claim or materially significant threatened claim against the Seller, or any claim or threatened claim that may affect the Seller that is discovered by either party.  The Seller will provide notice promptly to the Buyer of any claim or threatened claim against Buyer, or any claim or threatened claim that may affect Buyer, that is discovered by Seller.  Additionally, Seller will provide to Buyer notice of any bankruptcy filing it may receive after the applicable Closing Date.

6.7   <u>Seller As Witness</u>.  If Buyer, upon reasonable written notice to Seller, requests or subpoenas an officer or employee of Seller to appear at a trial, hearing or deposition concerning an Account to testify about the Account, Seller shall ensure the requested employee appears at such hearing or deposition and will be available for consultation with Buyer.  Buyer will pay Seller for the officer's or employee's time in traveling to, attending and testifying at the trial, hearing or deposition, whether or not the officer or employee is called as a witness, at the hourly rate equivalent of such officer or employee.  Buyer will also reimburse Seller for the officer's or employee's reasonable out-of-pocket, travel-related expenses.

6.8   <u>Seller's Obligation to Forward Payments and Mail to Buyer</u>.  Each month after the applicable Closing Date, Seller will forward to Buyer an Account level report detailing all payments Seller has received after the applicable Cut-Off Date on the Accounts.  In accordance with Section 2.4, Seller shall wire payment to Buyer or enclose a check for such payments.  In the event that any such payments are reversed for insufficient funds, Buyer shall promptly refund any such payment previously received to Seller less any processing fee paid pursuant to Section 2.4.  Additionally, on a monthly basis, Seller will forward all mail received relating to the Accounts to Buyer, subject to Seller's right to retain copies thereof to the extent the Seller's interests are affected. Notwithstanding anything to the contrary in this Section 6.8, Seller shall notify Buyer of Seller's receipt of any payment received on any Account as soon as commercially practical.

6.9   <u>UCC Financing Statements</u>.  Buyer may prepare on or after the applicable Closing Date such UCC financing statements, which shall conform to Exhibit 5, for filing in such jurisdictions as the Buyer may deem necessary or appropriate. The parties agree that UCC financing statements shall be for notice purposes only and shall expressly indicate that UCC financing statements are for notice purposes only and create no security interest in the assets, property or interests of the Seller.  Except for the insertion of the secured party's name, if Buyer proposes to modify the UCC financing statement, including but not limited to changing the description of collateral, Buyer must (i) notify Seller, and (ii) obtain Seller's prior written approval before filing such financing statements, which approval shall not be unreasonably withheld. If the Seller discovers that Buyer has filed a financing statement which either does not conform to Exhibit 5 and the Buyer has not obtained prior approval for any change, or the financing statement is not for notice purposes only but instead creates or attempts to create a security interest in assets, property or interests of the Seller, Buyer shall take steps to terminate the financing statement as soon as commercially practical after receiving written or electronic notice from the Seller.  If the

Contract ID: OP3NU1BM041213

Buyer fails to take such steps in a timely manner, Buyer hereby authorizes Seller to file such termination statement on behalf of Buyer.

6.10   Contacts by Obligors and Government Entities.  In the event Seller is contacted after the Closing Date by a Obligor or government entity seeking information about a sold account, Seller may, but shall not be obligated to, provide relevant information and Account or Other Documents to such requestor. If Seller supplies information, Seller will notify Buyer of such request and describe the information provided. Notwithstanding the above, Seller will at all times comply with all relevant privacy laws.

## 7.   USE OF SELLER'S NAME

7.1   Use of Names.   The Buyer will not use or refer to the name "CitiFinancial Inc," "Citibank," "Citibank Classic," "Citicorp," "Citigroup", "Associates Capital Bank, Inc.", "Associates Credit Card Services, Inc.", "Associates Commerce Solutions", "Associates National Bank", "Universal Card Services Corp." or or any similar name or successor corporation, except to reference such names for purposes of identifying an Account in communications with the Account's Obligor, in collecting amounts outstanding on the Account, and in conducting litigation or participating in a bankruptcy proceeding with respect to the Account.  Buyer shall not represent that there is an affiliation or agency relationship between Buyer and the Seller, nor shall Buyer state or represent in any way that it is acting for or on behalf of the Seller.  Buyer shall not misrepresent, mislead or otherwise fail adequately to disclose its ownership of the Accounts.  Buyer may also use or refer to the Seller's name solely to establish from whom the Accounts were acquired as part of any resale or financing of the Accounts and for tax, accounting, legal or regulatory purposes and in responding to inquiries from the Better Business Bureau and similar nongovernmental organizations. Furthermore, Buyer may include the Seller's name only within the K-1 segment of the Metro 1 or 2 furnishing file when reporting an Account to a credit bureau.

7.2   Breach.  Buyer and the Seller acknowledge that Buyer's breach of this Article 7 will result in actual and substantial damages to the Seller.  Therefore, if the Buyer breaches any part of this Article 7, then Seller shall have the right to seek and obtain in any court of competent jurisdiction an injunction to restrain a violation, alleged violation, or continuing violation by the Buyer.  In addition to all equitable claims, Seller shall be entitled to bring any and all separate clams to recover damages against Buyer that Seller may suffer as a result of Buyer's breach. Seller may recover its costs incurred in bringing any successful action under this Article 7, including but not limited to reasonable attorney fees and court costs.  Further, Buyer shall immediately cease and desist from continuing any act that is alleged by Seller to be a violation of this Article 7, and Buyer shall take whatever action that is necessary to correct any violation of this Article 7 upon receiving written notice from Seller.  In addition, if Buyer breaches this Article 7, Buyer will pay the Seller the sum of $10,000.00 for each breach (each breach being the single use of the above names, communicated to a third party as described above) as liquidated damages and in preventing Buyer's further breach of this provision.

## 8.   THE SELLER'S RIGHT TO REPURCHASE ACCOUNTS

8.1     Accounts Affected.   The Seller shall have the right to repurchase any Account that has not been paid in full, released or compromised by Buyer, if the Seller determines that the Obligor was deceased as of the applicable Cut-Off Date; that there is a pending or threatened suit, arbitration or other legal proceeding or investigation relating to an Account or an Obligor, and naming the Seller or otherwise involving the Seller's interest therein in a manner unacceptable to the Seller, or the Seller otherwise determines (in its sole discretion) that such matter cannot be resolved and/or that the Seller's interest therein cannot be adequately protected without the Seller owning such Account.   The Seller shall notify Buyer, in writing, of the identity of such Accounts.

8.2     Right to Repurchase.

(a)     Upon notice to Buyer, the Seller may repurchase any Account described in Section 8.1 by repaying to Buyer the Repurchase Price associated with the repurchased Account.

(b)     Upon delivering to the Seller a full accounting of the Account, Buyer may retain any money or value that Buyer collected or received on the Account before Buyer's receipt of the Seller's notice electing to repurchase the Account.   Buyer shall remit to Seller any payment received after that notice.   After Buyer has received the Seller's notice, Buyer will immediately cease releasing or compromising any Account.   Notwithstanding the foregoing, in the event that Seller needs to repurchase an Account within the first month of the applicable Closing Date, Buyer shall remit to Seller any payments received on the Account, net of any collection fees due third parties.

## 9.     RIGHT OF RESALE

9.1     Sale or Transfer to a Third Party.   Buyer may resell or transfer the ownership of any Account to a third party, including the transfer of Accountholder information (such as names and addresses) to any third party (each referred to as "Third Party Buyer"); provided, however, that Buyer must conduct commercially reasonable and prudent due diligence of the Third Party Buyer. The due diligence shall include, without limitation, (i) a financial review to ensure the financial strength of the Third Party Buyer; (ii) an information security review to ensure Third Party Buyer's systems meet commercially reasonable standards for the protection of data; and (iii) receipt of confirmation that the Third Party Buyer is a member of ACA International or DBA International. Buyer and Downstream Buyer shall upon request supply Seller written documentation establishing the required due diligence has been completed.   Buyer shall defend, indemnify and hold harmless Seller from any and all causes of action, claims, expenses or judgments incurred by Seller for which Buyer's Third Party Buyer or any buyer of Third Party Buyer (collectively referred to herein as "Downstream Buyer") is solely or partially responsible. Buyer shall require all Downstream Buyers to agree to be bound to all of the Buyer's obligations and limitations or remedies, and to acknowledge all of Seller's rights, set forth in this Agreement including, without limitation, the Sections in Articles 6, 7, 8, and 9.   All Downstream Buyers' requests for documentation pursuant to Section 6.2 must be made to Seller through Buyer, unless: (a) Seller otherwise agrees in writing; or (b) the documentation is now managed by Convoke.   Nothing in this Section 9.1 shall modify the indemnification provisions between Seller and Buyer as set forth in Article 10 of this Agreement.

Contract ID: OP3NU1BM041213

9.2    Exceptions.  Notwithstanding Section 9.1, Buyer may pledge or transfer Accounts to one or more of its wholly owned subsidiaries or affiliates or to a trust or other special purpose vehicle which is wholly owned by such subsidiary or affiliate or pledge Accounts for the sole purpose of obtaining financing and/or issuing asset-backed securities secured by such Accounts, provided that Buyer shall give Seller prior notice of the sale, pledge or transfer under this Section 9.2.

## 10.    INDEMNIFICATION

10.1    Indemnification by Buyer.  Buyer hereby agrees to indemnify, defend, and hold harmless the Seller, its parents, subsidiaries and affiliates, and their officers, directors and employees from and against any and all claims, damages, losses, costs or expenses (including any and all reasonable attorneys' and experts' fees), asserted by a third party that Seller might suffer, incur or be subjected to by reason of any legal action, proceeding, arbitration or other claim, whether commenced or threatened, whether or not well grounded and by whomsoever concerned, based upon any breach of this Agreement (provided that Buyer many not use "best of knowledge" qualifications contained in Section 4 as a defense or limitation to an indemnification hereunder), violation of any applicable law (including without limitation the Bankruptcy Code, FDCPA or FCRA);, or any other act or omission by Buyer, its officers, directors, agents, employees, representatives or any Downstream Buyers  with respect to any Account or any party obligated on an Account after the applicable Closing Date; provided, however, that, (i) the Seller notifies Buyer within a reasonable time of any such claim or action, (ii) such claims, damages, losses, costs or expenses are not solely attributable to any negligent act or omission by the Seller, its parent, affiliates, subsidiaries, contractors, agents or any of their employees or agents and (iii) the Seller provides Buyer with information that is available to the Seller and is reasonably necessary for Buyer to prosecute its defense of the action and (iv) Seller shall use commercially reasonable efforts to mitigate any claim or liability it may assert under this section.

Buyer shall bear all reasonable expenses in connection with the defense and/or settlement of any such claim or suit.  The Seller shall have the right, at its own expense, to participate in the defense of any claim against which it is indemnified and which has been assumed by the obligation or indemnity hereunder; Buyer, in the defense of any such claim, except with the written consent of the Seller, shall not consent to entry of any judgment or enter into any settlement that either:  (a) does not include, as an unconditional term, the grant by the claimant to the Seller of a release of all liabilities in respect of such claims, or (b) otherwise adversely affects the rights of the Seller.

10.2    Indemnification by Seller.  Seller hereby agrees to indemnify, defend, and hold harmless the Buyer, its permitted assigns, parents, subsidiaries and affiliates, and their officers, directors and employees from and against any and all claims, damages, losses costs or expenses (including any and all reasonable attorneys' and experts' fees) asserted by a third party that Buyer might suffer, incur or be subjected to by reason of any legal action, proceeding, arbitration or other claim, whether commenced or threatened, whether or not well grounded and by whomsoever concerned, based upon any breach of this Agreement by Seller (provided that Seller may not use "best of knowledge" qualifications contained in Article 3 as a defense or limitation to indemnification hereunder), or any other act or omission by Seller, its predecessors in interest, its

Contract ID: OP3NU1BM041213

officers, directors, agents, employees, or representatives with respect to any Account or any party obligated on an Account prior to an applicable Closing Date, provided, however, that (i) the Buyer notifies Seller within a reasonable time of any such claim or action, (ii) such claims, damages, losses, costs or expenses are not solely attributable to any negligent act or omission by the Buyer, its parent, affiliates, subsidiaries, transferees, contractors, agents or any of their employees or agent (iii) the Buyer provides Seller with information that is available to the Buyer and is reasonably necessary for Seller to prosecute its defense of the action and (iv) Buyer shall use commercially reasonable efforts to mitigate any claim or liability it may assert under this section.

Seller shall bear all reasonable expenses in connection with the defense and/or settlement of any such claim or suit.  The Buyer shall have the right, at its own expense, to participate in the defense of any claim against which it is indemnified and the defense of which has been assumed by the Seller's obligation or indemnity hereunder.  Seller, in the defense of any such claim, except with the written consent of the Buyer, shall not consent to entry of any judgment or enter into any settlement that either, (a) does not include, as an unconditional term, the grant by the claimant to the Buyer of a release of all liabilities in respect of such claims, or (b) otherwise adversely affects the rights of the Buyer.

10.3   Survival.  The provisions of this Article 10 shall survive the termination or expiration of this Agreement.

## 11.   CONFIDENTIALITY

11.1   Confidential Information.  From and after the execution of this Agreement, Buyer hereto shall keep confidential, and shall use reasonable efforts to cause their respective officers, directors, employees and agents to keep confidential, any and all information obtained from the Seller concerning the assets, properties and business of the Seller, and shall not use such confidential information for any purpose other than those contemplated by this Agreement; *provided, however*, that Buyer shall not be subject to the obligations set forth in the preceding sentence with respect to any such information provided to it by the Seller which either (i) was in Buyer's possession at the time of the Seller's disclosure, (ii) was in the public domain at the time of the Seller's disclosure, or subsequently enters the public domain through no act or failure to act on the part of the Buyer (iii) is lawfully obtained by Buyer from a third party.  Nothing in this Agreement shall be construed to limit Buyer's obligations under the confidentiality agreement entered into between Buyer and the Seller with regard to Confidential Information other than Accounts sold hereunder. If Buyer or any of its employees become legally compelled (by deposition, interrogatory, request of documents, subpoena, civil investigative demand or similar process) to disclose any of the Confidential Information, Buyer shall provide Seller (to the extent permitted by law) with prompt written notice of such requirement so that Seller may seek a protective order or other appropriate remedy and/or waive compliance with the terms of this Agreement.  In the event that such protective order or other remedy is not obtained, Seller waives compliance with the provisions hereof, and Buyer may provide such information as is legally required to be furnished

11.2  <u>Public Announcement</u>.   Neither Buyer nor the Seller shall make any public announcement of this Agreement or provide any information concerning this Agreement or the subject matter hereof to any representative of the news media without the prior written approval of the other party.  The parties will not respond to any inquiry from public, governmental, or administrative authorities concerning this Agreement without prior consultation and coordination with each other.

11.3  <u>Survival</u>.   The provisions of this Article 11 shall survive the termination of this Agreement.

## 12.    GENERAL PROVISIONS

12.1  <u>Applicable Law</u>.  The laws of the State of New York shall govern the enforcement and interpretation of this Agreement and the rights, duties and obligations of the parties hereto.

12.2  <u>WAIVER OF JURY TRIAL</u>.  NOTWITHSTANDING ANYTHING STATED HEREIN, IF EITHER PARTY BRINGS ANY ACTION AGAINST THE OTHER PARTY, WHETHER AT LAW OR EQUITY, REGARDING THE OTHER PARTY'S PERFORMANCE UNDER THIS AGREEMENT OR BRINGS ANY ACTION CONNECTED IN ANY WAY WITH THIS AGREEMENT, THE PARTIES AGREE TO WAIVE TRIAL BY JURY.

12.3  <u>Notices</u>.  All notices or other documents required to be given pursuant to this Agreement shall be effective when received and shall be sufficient if sent by (i) facsimile, (ii) email, or (iii) in writing, hand delivered, sent by overnight air courier or certified United States mail, return receipt requested, addressed as follows:

<table>
<tr><td>If to Seller:</td><td>One Main Financial Inc.<br>Attn:  General Counsel<br>300 Saint Paul Place<br>Baltimore, MD 21202</td></tr>
<tr><td>And Copies to:</td><td>Citicorp Credit Services, Inc. (USA)<br>Attn:  Michael Taulbee<br>7920 NW 110th Street<br>Kansas City, MO  64153<br>Fax:816-505-6240<br>Email: michael.taulbee@citi.com</td></tr>
<tr><td>If to Buyer:</td><td>Ophrys, LLC<br>Attn:  Terry Grosvenor<br>2001 Western Avenue, Suite 430<br>Seattle, WA  98121</td></tr>
</table>

The parties hereto may at any time change the name and addresses of persons to whom must be sent all notices or other documents required to be given under this Agreement by giving written notice to the other party.

12.4    Binding Nature of Agreement.  This Agreement is and shall be binding upon and inure to the benefit of the parties hereto, and their respective legal representatives, successors and permitted assigns.

12.5    Assignment.    Neither party may assign this Agreement or any of its rights in this Agreement without the other's prior written consent, except as provided in Article 9 above. Notwithstanding the foregoing sentence, Seller may assign its rights and obligations under this Agreement to any of its affiliates, subsidiaries, or parent corporations without obtaining Buyer's permission or consent.

12.6    Expenses.  Except as otherwise expressly provided in this Agreement, Buyer and the Seller will each bear its own out-of-pocket expenses in connection with the transaction contemplated by this Agreement.

12.7    Entire Agreement.  This Agreement and the Exhibits hereto embody the entire agreement and understanding between the parties with respect to the subject matter hereof and supersede all prior agreements and understandings relating to such subject matter.    The parties make no representations or warranties to each other, except as contained in this Agreement or in the accompanying Exhibit or the certificates or other closing documents delivered in accordance with this Agreement. All prior representations and statements made by any party or its representatives, whether orally or in writing, are deemed to have been merged into this Agreement, except as otherwise stated in this Agreement.

12.8    Amendment.  Neither this Agreement nor any of its provisions may be changed, waived, discharged or terminated orally.  Any change, waiver, discharge or termination may be effected only by a writing signed by the party against which enforcement of such change, waiver, discharge or termination is sought.

12.9    Severability.  If any one or more of the provisions of this Agreement, for any reason, is held to be invalid, illegal or unenforceable, the invalidity, illegality or unenforceability will not affect any other provision of this Agreement, and this Agreement will be construed without the invalid, illegal or unenforceable provision.

12.10   Waiver.  Except as required under Section 3.4, no failure of any party to take any action or assert any right hereunder shall be deemed a waiver of such right in the event of the continuation or repetition of the circumstances giving rise to such right.

12.11   Headings.   Headings are for reference only, and will not affect the interpretation or meaning of any provision of this Agreement.

Contract ID: OP3NU1BM041213

12.12 Counterparts.  This Agreement may be signed in one or more counterparts, all of which taken together will be deemed one original.  In addition, such counterparts may be delivered via facsimile or email, and if so, will have the same force and effect as an original document.

12.13   Termination.  Either party may terminate this Agreement for convenience upon providing sixty (60) days prior notice, in writing, to the other party.  A party may terminate this Agreement at its discretion by giving the other party 60 days notice in which event the Agreement shall terminate as to future deliveries upon completion of the next two monthly deliveries after the giving of such notice. A party may terminate this Agreement, effective as of a date stated in a notice to the other party, as to any unfunded or future deliveries upon the other party's material breach of its obligations under the Agreement. Notwithstanding the foregoing, Seller reserves the right to terminate this Agreement immediately upon notice to Buyer in the event of a sale or transfer of all or substantially all Seller's Accounts. In such event any Account data or sale files delivered by Seller in anticipation of a delivery and funding shall be returned to Seller within two business days.

Further Assurances. From and after the applicable Closing Date, each party will take such action as the other party may reasonably request to carry out the purpose of the Agreement.

Contract ID: OP3NU1BM041213

IN WITNESS WHEREOF, the parties have executed this Agreement by their duly authorized officers as of the date first written above.

Seller:  OneMain Financial Inc., a Delaware corporation; OneMain Financial, Inc. a West Virginia corporation; OneMain Financial Services, Inc. a Minnesota corporation; OneMain Financial, Inc. a Hawaii corporation; CF Network Issuance Trust 2010-1, a Delaware corporation

By:

(Signature)

Name: Michael Taulbee

Michael Taulbee, SVP
GEID: 1000624635
Citibank, N.A.
7930 NW 110th St.
Kansas City, MO  64153
816-505-6884
michael.taulbee@citi.com

Title:   Senior Vice President

Ophrys, LLC

By:

(Signature)

Name: Aaron Edwards

Title: Vice Presdnt

## EXHIBIT 1
## ASSET SCHEDULE

The individual Accounts transferred are described in the final electronic file and delivered by the Seller to Buyer, the same deemed attached hereto by this reference.

| Lot | Sale ID | # of Accounts | Sale Amount | Sales Rate | Cut-Off Date |
|---|---|---|---|---|---|
| OneMain BK 13 | | | $ | | |

Contract ID: OP3NU1BM041213

## EXHIBIT 2
## BILL OF SALE AND ASSIGNMENT

THIS BILL OF SALE AND ASSIGNMENT dated as of [CLOSING DATE] between the undersigned entities, with offices located at 300 Saint Paul Place, Baltimore, MD 21202 (collectively, the "Seller") and [BUYER], organized under the laws of the [GOVERNING LOCATION] located at [BUYER ADDRESS] ("Buyer").

For value received and subject to the terms and conditions of the Purchase and Sale Agreement dated [AGREEMENT DATE], between Buyer and the Seller (the "Agreement"), the Seller does hereby transfer, sell, assign, convey, grant, bargain, set over and deliver to Buyer, and to Buyer's successors and assigns, all of the Seller's right, title and interest in and to the Accounts described in Exhibit 1 and outlined in the final electronic file.

Seller: OneMain Financial Inc., a Delaware corporation; OneMain Financial, Inc. a West Virginia corporation; OneMain Financial Services, Inc. a Minnesota corporation; OneMain Financial, Inc. a Hawaii corporation; CF Network Issuance Trust 2010-1, a Delaware corporation

By: _____
        (Signature)
Name: _____

Title: _____

Contract ID: OP3NU1BM041213

**EXHIBIT 3**
Intentionally left blank.

**EXHIBIT 4**
**AFFIDAVIT OF SALE**
**OF ACCOUNT**
**BY ORIGINAL CREDITOR**

**STATE OF MISSOURI**
**COUNTY OF PLATTE**

Garon Robinett being duly sworn, deposes and says:

I am over 18 and not a party to this action.  I am a Vice President of the following entities:
OneMain Financial Inc. (Delaware); OneMain Financial, Inc. (West Virginia); OneMain
Financial Services, Inc. (Minnesota); OneMain Financial, Inc. (Hawaii), and am authorized to
make the statements and representations herein.  In that position I have access to the creditor's
records, and am aware of the process of the sale of accounts and electronic storage of business
records.

On or about [CLOSING DATE] the above entities sold a pool of charged-off accounts (the
Accounts) by a Purchase and Sale Agreement and a Bill of Sale to [BUYER]. As part of the sale
of the Accounts, certain electronic records were transferred on individual Accounts to the debt
buyer.  These records were kept in the ordinary course of business of the above entities.

I am not aware of any errors in the information provided about the accounts.  The above
statements are true to the best of my knowledge.

Signed this _____ day of _____, _____.


_____

Garon Robinett

STATE OF MISSOURI        )
                         ) ss.
COUNTY OF PLATTE         )

On this ____ day of_____, 20__, before the undersigned Notary Public in and for the
state of _____, personally appeared _____, known to me to be the
person who executed the Affidavit on behalf of the above-named Plaintiff, and acknowledged to
me that he/she executed the same for the purposes therein state.

Subscribed and sworn before me this _____ day of _____, _____.
_____
(Notary Stamp)

**CERTIFICATE OF CONFORMITY**

Contract ID: OP3NU1BM041213

**STATE OF MISSOURI**
**COUNTY OF PLATTE**


        The undersigned does hereby certify that he/she is an attorney at law duly admitted to practice in the State of Missouri and is a resident of _____, in the State of _____; that he/she is a person duly qualified to make this certificate of conformity pursuant to the laws of the State of Missouri; that the foregoing acknowledgment by Garon Robinett named in the foregoing instrument taken before_____, a notary in the State of Missouri, was taken in the manner prescribed by such laws of the State of Missouri, being the State in which it was taken; and that it duly conforms with such laws and is in all respects valid and effective in such state.


_____
Date

_____
Attorney at law in the State of Missouri


_____
Printed Name

Contract ID: OP3NU1BM041213

# EXHIBIT 5
# UCC-1 FORM

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO:  (Name and Address)

| Print | Reset |
|---|---|

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

1a. ORGANIZATION'S NAME

**One Main Financial Inc.**

OR 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **300 Saint Paul Place** | **Baltimore** | **MD** | **21202** | **USA** |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any | ☐ NONE |
|---|---|---|---|---|---|

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

2a. ORGANIZATION'S NAME

OR 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | ☐ NONE |
|---|---|---|---|---|---|

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

3a. ORGANIZATION'S NAME

OR 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

4. This FINANCING STATEMENT covers the following collateral:

All accounts purchased pursuant to the Purchase and Sale Agreement dated ( ) by and among One Main Financial, Inc. and (Buyer).

One Main Financial, Inc. and (Buyer) intent the transactions contemplated by the agreement to constitute an absolute assignment of CitiBank N.A.'s interest in the accounts, and this filing should not be construed as a conclusion that an absolute assignment has not occurred.  This Financing Statement is not to be construed as evidence of the existence of any indebtedness of CitiBank N.A.

No security interest is created by the filing of this Financing Statement in any accounts or property owned by One Main Financial, Inc. other than those accounts purchased by (Buyer) pursuant to the Purchase and Sale Agreements dated ( ) by and among One Main Financial, Inc.

| 5. ALTERNATIVE DESIGNATION [if applicable]: | LESSEE/LESSOR | CONSIGNEE/CONSIGNOR | BAILEE/BAILOR | SELLER/BUYER | AG. LIEN | NON-UCC FILING |
|---|---|---|---|---|---|---|
| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.    Attach Addendum | | [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | | All Debtors | Debtor 1 | Debtor 2 |
| 8. OPTIONAL FILER REFERENCE DATA | | | | | | |

International Association of Commercial Administrators (IACA)

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)