IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| OPHRYS, LLC,<br><br>                          Plaintiff,<br><br>     v.<br><br>ONEMAIN FINANCIAL, INC., et al.,<br><br>                         Defendants. | Civil Action No. 17-260-RGA |

MEMORANDUM OPINION

Neal J. Levitsky, Seth A. Niederman, E. Chaney Hall, FOX ROTHSCHILD LLP, Wilmington, DE; Spencer Hall (argued), SPENCER HALL PLLC, Seattle, WA;

    Attorneys for Plaintiff

Stacey A. Scrivani, STEVENS & LEE, P.C., Wilmington, DE; Joseph Wolfson (argued), STEVENS & LEE, P.C., Philadelphia, PA;

    Attorneys for Defendants

January 22, 2020

**ANDREWS, U.S. DISTRICT JUDGE:**

In this diversity action, Plaintiff Ophrys, LLC alleges Defendant OneMain Financial, Inc. and its affiliates breached a contract for the sale of consumer loans. (D.I. 40). Currently before the Court is Defendants' Motion for Summary Judgment. (D.I. 79). The matter has been fully briefed. (D.I. 80, 85, 93). The court held oral argument on December 2, 2019. (D.I. 102). Because Plaintiff failed to comply with the notice provision of the contract, Defendants' Motion is GRANTED.

## I. BACKGROUND

Ophrys is in the debt collection business. It buys portfolios of debt and attempts to collect from the delinquent borrowers. (D.I. 40 at 3). The OneMain Defendants are a group of affiliated entities that provide loans to consumers. (*Id.* at 2). At the time of the contract in dispute here, the OneMain entities were owned by Citibank, which is a division of Citigroup, Inc. (*Id.*).

On April 12, 2013, Ophrys and OneMain signed the "Forward Flow Agreement," which allowed Ophrys, on a monthly basis, to buy accounts of Citibank credit card debt and OneMain loan debt. (D.I. 40, Ex. A, "Agreement"). The accounts were believed to all be in Chapter 13 bankruptcy proceedings.

Under Section 3.3.1(j) of the Agreement, OneMain represented that, for each account, the "information provided . . . on the due diligence file is substantially similar to the final electronic file." (*Id.* at 5). Under Section 3.3.1(k), OneMain represented that the information in the electronic files was "materially true and correct." (*Id.*). Ophrys alleges OneMain breached these provisions, which are both in Article 3 of the contract. (D.I. 40 at 7, 10).

OneMain counters that Ophrys failed to comply with the contract's notice provision. Specifically, under Section 3.4(a) of the Agreement, Ophrys's "sole remedy" against OneMain

1

(other than an indemnification provision not relevant here) for a "breach of any of the representations listed in Article 3 shall be to notify [OneMain] of the breach ('Notice of Claim') no later than 180 days from the applicable Closing Date." (Agreement at 5). Following such a notice, OneMain would have had the option of either curing the breach or repurchasing the affected accounts. (*Id.*). Failure to provide notice of any breach "shall terminate and waive any rights [Ophrys] may have to any remedy for breach under Article 3 of this Agreement." (*Id.*). Section 3.4(b) required that the notice include specific details about the deficient accounts, and Section 12.3 required that the notices be sent to OneMain's general counsel in Baltimore, with a copy to the attention of Michael Taulbee of Citigroup in Kansas City. (*Id.* at 6, 16).

On September 13, 2013, Jaye, an individual in asset sales support at Citibank, emailed Ophrys representatives and requested, "Going forward please submit all putbacks and account level questions to: assetsalessupport@citi.com and not to our individual emails as it causes email overload." (D.I. 87, Ex. 4). Following this email, Ophrys used the Citibank email address on about 14 occasions to successfully sell back accounts. (D.I. 86, "Weinstein Decl.," ¶ 19).

On December 12, 2014, Eric Hyndman, an Ophrys representative, emailed the "assetsalessupport@citi.com" address:

> Ophrys is instituting a new process of reporting in an effort to ensure quality and accuracy of the claims being filed. We have attached a file containing POC accounts that were purchased by Ophrys, which we are seeking more information.
>
> The report is broken out by tabs, with different scenarios on each tab. We ask that you please research these accounts and let us know whether you can or cannot provide us with the missing or corrected information.

(D.I. 87, Ex. 5). The attachment identified 1,691 accounts (1,680 of which were purchased within the previous 180 days), which were allegedly missing information such as the last payment date, the principal amount, or the last purchase date. (Weinstein Decl., ¶ 20). OneMain

2

and Citibank did not respond to this inquiry. On January 2, Hyndman emailed the Citi address requesting an "update" on his request. (D.I. 87, Ex. 6). Three days later, he sent an email that was identical to his Dec. 12 email. (D.I. 87, Ex. 7).

On May 2, 2015, Aaron Johnson, Ophrys's chief operating officer, sent an email with an attached letter to "assetsalessupport@citi.com." In the letter, addressed to the "Asset Sales Team," Johnson wrote, "Citi and Ophrys developed a process at the end of 2014 to provide Citi the data quality related to Bankruptcy Rule 3001 and to solicit correct and accurate data." (D.I. 87, Ex. 8). Federal Rule of Bankruptcy Procedure 3001 requires a creditor to present certain documentation to file a claim in a bankruptcy proceeding. Johnson continued:

> As indicated by the notification of the quality data check, Ophrys sent a first wave of accounts in December 2014. There were a large number of accounts which did not pass the quality check and Ophrys sent the accounts to the Citi Asset Sales team distribution list for guidance. There was no response by Citi and Ophrys followed up again in January 2015. Again, there was no response. When an issue was identified, the matter was escalated again in March 2015[1] and Ophrys finally received a response. However, the response did not complete the information requested. There was no effort by Citi to follow up and inquire as to what was being requested. This lack of response led to a number of claims expiring over the period from December 2014 to February 2015.

(*Id.*). Johnson went on to explain that Ophrys had "enacted some counter measures in an attempt to salvage a majority of the claims," but that the company did not expect to collect on many of the accounts. Johnson requested a "special putback provision" (i.e., a buyback) for the accounts that Ophrys would be unable to collect on because Ophrys "did not receive the requested guidance or a timely response." (*Id.*). About two weeks later, Ophrys emailed the Citibank email

---

[1] This escalation in March 2015 is not otherwise cited in the record, and Ophrys does not rely on it in its briefing. (*See* D.I. 85 at 10).

3

address again with a spreadsheet identifying 318 accounts it wanted repurchased. (Weinstein Decl., ¶ 24).

Citibank and Ophrys representatives eventually spoke by telephone, and, on June 3, 2015, Citibank responded in writing. (D.I. 87, Ex. 13). A Citibank sales official asserted the information about the accounts was "fully disclosed during the bid process" and the company had no "obligation to provide additional data other than what was contractually agreed to at the time of sale." (*Id.*). As a result, Citibank declined to buy back the accounts. (*Id.*).

The parties continued to negotiate over the ensuing months but failed to resolve their dispute. (Weinstein Decl., ¶ 27-33). On August 26, 2016, Ophrys's chief legal officer sent a "formal notice under Section 12.3 of the Agreement" to OneMain's general counsel and to Citibank. (D.I. 87, Ex. 25). Ophrys filed this lawsuit on March 13, 2017. (D.I. 1).

## II. LEGAL STANDARDS

### A. Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party has the initial burden of proving the absence of a genuinely disputed material fact relative to the claims in question. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The burden on the moving party may be discharged by pointing out to the district court that there is an absence of evidence supporting the non-moving party's case. *Celotex*, 477 U.S. at 323.

4

The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460–61 (3d Cir. 1989). A non-moving party asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the opposing party] do not establish the absence . . . of a genuine dispute . . . ." FED. R. CIV. P. 56(c)(1).

When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). A dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson*, 477 U.S. at 247-49. If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp.*, 477 U.S. at 322.

### B. New York Contract Law

The parties agreed New York law would govern the enforcement and interpretation of the contract. (Agreement at 16). Under New York law, "the terms of a written agreement define the rights and obligations of the parties," and courts "should strive to give a fair and reasonable meaning to the language used." *Abiele Contracting, Inc. v. New York City Sch. Constr. Auth.*, 689 N.E.2d 864, 868 (N.Y. Ct. App. 1997).

Generally, "written notice requirements are fully enforceable." *Art of War Music Pub., Inc. v. Mark Andrews*, 2000 WL 245908, at *2 (S.D.N.Y. Mar. 3, 2000). When parties agree to "provide notice and an opportunity to cure prior to suing for performance or asserting termination rights under a contract, those covenants must be adhered to. A party's failure to do so renders ineffective that party's rights to pursue those other remedies." *Sauer v. Xerox Corp.*, 17 F. Supp. 2d 193, 197 (W.D.N.Y. 1998), *aff'd*, 5 F. App'x 52 (2d Cir. 2001). New York law, however, does not demand "strict compliance" with notice provisions if there was actual notice and no prejudice caused by the deviation. *Suarez v. Ingalls*, 723 N.Y.S.2d 380 (App. Div. 2001).

## III. DISCUSSION

Ophrys failed to comply with the literal terms of the contract's notice provision. Section 3.4(a) required Ophrys to notify OneMain of a breach within 180 days of the purchase, and Section 12.3 required Ophrys to send the notice to OneMain's general counsel. Instead, Ophrys emailed mere inquiries, not a notice of breach, to "assetsalessupport@citi.com." Ophrys sent a "formal notice" of an alleged breach to OneMain's general counsel in August 2016—far more than 180 days after the relevant purchases. Even if the relevant purchases occurred immediately before the December 12, 2014 email, the 180-day window for notice would have expired on June 5, 2015.

Ophrys argues its December 2014 email to the Citibank address fulfilled its obligations under the notice provision because 1) it provided OneMain with actual notice of the breach, and 2) the deviations from the notice requirements did not prejudice OneMain. (D.I. 101 at 2). New York courts have not demanded "strict compliance" with notice provisions when parties have sent notices by letter instead of certified mail, *Dellicarri v. Hirschfeld*, 619 N.Y.S.2d 816 (1994);

*Suarez* 723 N.Y.S.2d at 380, or by email instead of certified mail, *Rockland Exposition, Inc. v. All. of Auto. Serv. Providers of New Jersey*, 706 F. Supp. 2d 350, 360 (S.D.N.Y. 2009).

Here though, the deficiency in Orphys's notice was not merely the method of its delivery. Rather, the December 2014 email did not constitute "actual notice" because it failed to notify OneMain that it was in breach of the contract. It merely requested more information about certain accounts. Notice of a breach must "objectively" put a party on notice of the "drastic legal repercussions that could result from noncompliance." *Gil Enterprises, Inc. v. Delvy*, 79 F.3d 241, 246-47 (2d Cir. 1996). In *USI Ins. Servs. LLC v. Miner*, the court found that the plaintiff had not complied with a notice provision because he never "mention[ed] that he believed a 'breach' had occurred or that he would 'sue.'" 801 F. Supp. 2d 175, 183 (S.D.N.Y. 2011). Instead, "the conversations [were] cordial and constitute[d] the normal to-ing and fro-ing of working through complaints." *Id.*

Similarly here, Ophrys did not mention a breach or the potential for litigation. In fact, the December 2014 email made no reference to the contract or any contractual obligations at all. The email was just part of the "normal to-ing and fro-ing of working through complaints" about the accounts. *USI Ins. Servs.*, 801 F. Supp. 2d at 183. Ophrys sales staff simply asked Citibank to "please research these accounts and let us know whether you can or cannot provide us with the missing or corrected information." (D.I. 87, Ex. 5). No reasonable jury could conclude that this kind of request for information is enough to "objectively" put OneMain on notice of a breach.

Ophrys's opposition to summary judgment focuses on this December 2014 email (D.I. 85 at 18-20), but the other communications within the 180-day window were also insufficient to satisfy the contract's notice provision. Like the December 2014 email, these subsequent communications requested more information, without referencing a breach of the contract or the

7

potential for litigation. In two January 2015 emails, Ophrys merely asked for an "update" and then re-sent its request for missing details. (D.I. 87, Exs. 6, 7). On May 2, 2015, Ophrys identified accounts it claimed did not comply with bankruptcy regulations, but it did not allege OneMain had breached any of its contractual obligations. (D.I. 87, Ex. 8). Because Ophrys has failed to point to any communications that reasonably could have satisfied the notice requirement, I find there is no genuine dispute of material fact in this case. Under the explicit terms of the contract, Ophrys's failure to provide notice "terminate[d] and waive[d]" the rights it is seeking to assert here. (Agreement at 5).

OneMain argues that any notice was sent to the wrong address. (D.I. 80 at 7). Ophrys responds that the notice provision was modified by the email from Jaye on September 3, 2013, requesting that "all putbacks and account level questions" be sent to the assetsalessupport@citi.com address. (D.I. 85 at 18). While it is highly doubtful that an operations-level email based on "email overload" to individual email in-boxes was a written modification of the contract's requirement of notice to a named individual and corporate general counsel, in light of my conclusion that there was no notice at all, I do not need to decide the issue.

According to Ophrys, its emails to the Citibank address shifted the burden to OneMain to inform Ophrys if the notice was incomplete. (D.I. 85 at 16-17). Section 3.4(b) of the Agreement required Ophrys to include specific information about each account it wanted OneMain to repurchase. The section further provided, "If the Seller determines that Buyer has submitted an Account for repurchase without the necessary information and documentation, the seller shall notify the Buyer of such defect." (Agreement at 6). Thus, if Ophrys failed to include a Social Security Number or obligor name on accounts it wanted to sell back, OneMain would have had

8

to identify that missing information to Ophrys. The problem here though was not about missing account details. The problem was that Ophrys did not notify OneMain of a breach at all. The notification burden therefore never shifted to OneMain.

It is true that, under New York law, "a contract should not be interpreted to produce an absurd result, one that is commercially unreasonable, or one that is contrary to the intent of the parties." *Platinum Equity Advisors, LLC v. SDI, Inc.*, 41 N.Y.S.3d 721 (N.Y. Sup. Ct. 2016). Enforcing this Agreement's notice provision, though, has none of those problems. "[W]ritten notice provisions serve the valuable function of allowing the purportedly breaching party to distinguish between minor complaints or posturing by its contractual partner and an actual threat of termination." *Art of War Music Pub., Inc.*, 2000 WL 245908, at *2. Ophrys's requests for information never amounted to an actual threat of termination. OneMain's failure to even respond to those multiple inquires is far from commendable, but OneMain's conduct did not nullify the notice provision. It is not absurd, commercially unreasonable, or contrary to the intent of the parties to interpret the notice provision as requiring that a party objectively be put on notice of a breach.

## IV. CONCLUSION

For these reasons, I will grant Defendants' Motion for Summary Judgment. An Order consistent with this Opinion will be entered.